18-2164. Before you start we're going to have Ms. Sprague, Mr. Hughes, Ms. Singer and Mr. White, so four arguments. 15 minutes aside still. Ms. Sprague you may proceed. May it please the court, I'm Mary Gabrielle Sprague for the United States. Richard Hughes is arguing for the Pueblos. I plan to argue for six minutes and turn it over to Mr. Hughes for six minutes and we'd like to reserve three minutes for rebuttal. The district court erred in relying on unexercised sovereign authority. If unexercised sovereign authority to resolve disputes over the use of natural resources were sufficient to extinguish aboriginal rights, there would be no doctrine of aboriginal rights in federal law. That is because every conquering European sovereign held ultimate power to control the use of natural resources, including water, within its territory. Yet every conquering sovereign recognized the aboriginal rights of the Native Indians to their land and resources. The Supreme Court made this clear when first articulating the federal doctrine of aboriginal water rights in Johnson v. McIntosh. May I interrupt for a moment to make sure what's at stake here? As I understand it, the U.S. and the Pueblos ultimately are arguing for an aboriginal right that included priority for even future use, similar to the Pueblo water rights doctrine. That is not an issue before us, the extent of the aboriginal right? Is that correct? That is correct. That is issue number three, which is quantifying the aboriginal right. So you're asking us to find that they still have the aboriginal right, but it would still be left for the district court in the first instance to determine the extent of that right? That's correct, Your Honor. So the only issue is sentence one of the order of certification, which is whether rights can be abrogated if no action is taken against those rights, but simply an assertion of authority over those rights. Correct, Your Honor. That's the only issue. Okay. How much water are we talking about in the stream? Your Honor, I do not know that. What's the CFS? Because work is still ongoing, as I understand it, to quantify the flow of the stream, which of course varies from year to year and from month to month. Right. And that work is ongoing. Well, there's no dispute that the stream's over-appropriated. I do not believe there is a dispute. Correct. And just to cut to the chase on the United States theory, is it your allegation that your entitlement to future use would allow you to take the entire stream historically? Your Honor, it's theoretically possible, but as it works out, these cases are typically settled and it's the policy of the federal government to come up with a solution that would include federal investment. If you prevail and your future uses would include an entitlement to the entire stream, why would the Pueblos ever settle? Well, it doesn't necessarily entitle them to the entire stream. That all still has to be quantified. What the state is arguing for is the state law of prior appropriation. We are arguing for aboriginal rights, which may include some future use components. And let me back up one step to that, because one of the problems I have with the case is I feel that we're answering a fairly abstract, high-level question when there's a lot of other information that might or should be helpful to elucidating the answer to that question. And one thing we don't know is what the United States, what your position is on future uses for the Pueblo. You know, I've read a lot of these cases. I've read Cohen. Is it irrigation only? Is it irrigation plus grazing? Is it casinos? Is it golf courses? Is it a water bottle plant? I mean, what are the future uses we're talking about? Right, Your Honor, that does remain to be determined. As a general matter of theory, we are arguing for water rights that are commensurate with the federal reserved water right. As this court said in the Ammit decision in 1976, that these are not technically reserved water rights. But the court directed attention to Arizona versus California, where the idea of practically irrigable agriculture was discussed. So that does remain to be determined. But basically the United States is asking for these Pueblos to be treated like other Indian tribes, as they should under Sandoval and under Candelaria, and not to be discriminated against because of the unique status of their land tenure. So you're not limited to irrigation uses at the quantification stage? Correct. We have not limited the claim to irrigation. But what if we want to build a manufacturing plant there that would take all the stream? Would that be permissible under your theory of the original rights? Your Honor, that's quantification, and that ask still has to be made. This case needs to go to trial. After there's a theoretical ruling on are there future uses, then the evidence would be put forward, and that would be decided. Should we send it back to see what uses are being asserted by the Pueblo? No, I mean, the parties agreed to a staged briefing, and we've run into this issue where we believe that the court should decide it at this point, so then the parties can go forward with an understanding that there are aboriginal water rights, but with full ability to shape those rights. You would have no problems if we entered an order in your favor saying that we believe affirmative actions are necessary to abrogate water rights, but we express no opinion whatsoever about the scope of those rights, their durability, the uses of them, or anything else. Correct. You would have no problems with that ruling at all, would you? Correct, Your Honor, and I think I've used my six minutes. All right. May it please the Court, Richard Hughes for the Pueblos. Your Honors, first of all, let me say that for about seven years the Pueblos were engaged in settlement negotiations with the state, and at that time they had agreed to accept a total of water rights that amounted to a little less than 10,000 acre-feet per year, so we're not talking about taking the entire flow of the stream. We're just talking about having aboriginal rights, meaning a superior priority that is not subject to loss by non-use. Is there any limit on your future use amounts you could take under the future use doctrine? From the beginning of this litigation we have insisted that our rights should be quantified by a fixed amount, in the same manner that federally reserved rights are quantified. So we are not talking about an infinitely expanding future right. How many other users are on the stream besides the Pueblos? There are several hundred non-Indians who live upstream of the Pueblos. There's a small community called San Ysidro that is located between the Pueblos of Jemez and Zia, but otherwise it's just the three Pueblos. The point I would like to make here is that the district court decision and the recommended decision of the magistrate below rested their conclusion that the imposition of Spanish sovereignty in the Southwest had totally extinguished all aboriginal rights of the Pueblos on a single phrase in the Supreme Court's decision in Santa Fe Pacific. And the reason that's been certified for us is if that is a correct decision, that wipes out everything. Wipes out everything. But if that's wrong, then we get back to all the merits and all the deliberations and everything else in the case is over. Absolutely, Your Honor, and just as the proposed order— If we don't, it all goes back for full consideration. Well, that's a good point. Judge Vasquez in her decision below said, well, this doesn't mean that the Pueblos don't have any rights to take water from the Rio Jemez. But then she didn't say what rights we would have in light of her decision. If they were extinguished, I assume you'd have no rights. One would think that that's the case. But the fact is that the history shows that at all times, Spain not only recognized that the Pueblos had the rights to use the water in the stream throughout the period of Spanish colonization, but Spanish law and policy deliberately was pervaded with a sense of protection and respect for the Pueblos' property rights. And the one repartimiento, the water dispute, that occurred in the entire quarter millennium of Spanish and Mexican rule in New Mexico, the Taos case of 1823—this is under Mexican rule, not Spanish rule—refutes the decision below completely because in that case, the ayuntamiento, the local governing body that conducted the proceeding, recognized that Taos Pueblo, although there were other users on the Rio Lucero, recognized that Taos Pueblo was the dueño de su ataco, the complete owner of all of the water in the river, and that because of its antiquity, its primacy, and its priority, it was entitled to a strong preference so that while the ayuntamiento allowed the squatter community of Orioseco to take a small amount of water when water was abundant, in times of shortage, they decreed that they had to cut that use back so that there would be no lack, no lack of water for the first user, meaning the Pueblo. That decision clearly recognizes the aboriginal rights of Taos Pueblo. And as I say, this is in 1823, 235 years after, according to the decision below, all those rights had been extinguished. Can you help me a little bit on the history? One thing I struggle with in this case is the aboriginal right to the property, the real estate. That's clear. I mean, you occupy it exclusively, whatever the test is. But water is a little different property right. I took water law at CU Law School a long time ago and practiced a little of that. So, you know, whiskey's for drinking and water's for fighting over, right? And the magistrate judge in the district court found some, you know, historical facts inconsistent with more or less your right to the stream. I may be overstating that a little bit, but I think that's the implication of your argument. Yet, as I understand it, the Jemez tribes were relocated down the valley at some point. No, Your Honor. These three Pueblos have been located in their present location since long before the Spanish arrived in the southwest. And so the Spanish did no forcible relocation of the Pueblos? No, none. Jemez Pueblo at one time originally had a number of different villages reaching farther up into the mountains. And the Spaniards did because they were having – Jemez was resisting the imposition of Spanish rule. Jemez – the Spaniards did eventually consolidate Jemez in its current location of the village of Vuelator. But Zia and Santa Ana have never been changed from their present location. At least as to Jemez, why wouldn't that be somewhat inconsistent with – or somewhat consistent with the sovereign Spain exercising control over at least some of the resources of the tribe? There is nothing in that history – as I say, that was a time of hostilities between the Spaniards and the Jemez Pueblo. But there is nothing in the historical record that suggests that that had anything whatever to do with the water rights of the Jemez Pueblo. They still had to feed the same number of people. What about the grants to the San Diego and San Isidro? The argument is that that would be inconsistent with the Pueblos. And that argument is totally baseless. It has no merit. First of all, those grants were made almost 200 years after, according to the decision below, the Pueblos' aboriginal rights had been extinguished. So they really are irrelevant. Secondly, I might mention, of course, that neither of those grants is mentioned in either the recommended decision of the magistrate or the district court decision. So technically, they're just not even an issue here. But thirdly – Under your theory of the case, then, could whatever water they've been using historically would be second in priority to the Pueblos? Absolutely. Certainly second in priority. And there is absolutely no evidence that the use of water by the settlers on those two grants had any effect on the Pueblos' use of the waters that they needed for their purposes. And that's a fallacy that pervades the briefs of the state and the non-Indians, that aboriginal use necessarily means exclusive use of the water. That is simply not true. There is no basis for that. If there's plenty of water for everybody to take what they need, then people can take what they need. No dispute ever arose even after those two grants were made. But now there's a dispute, right? There's only a dispute. And there's a couple hundred appropriators on the stream. Your Honor, to say that there's a dispute is not entirely clear. There's an adjudication going on in order to determine the rights of the non-Indians and the Pueblos. The non-Indians' rights have actually been determined in a subfile order. Do you agree with Ms. Sprague that the Pueblos would not be limited to irrigation uses for the water, that they could use any reasonable purpose for the water? Your Honor, federal law, which this Court has already held, applies to the Pueblos' water rights, is that once the rights are adjudicated, an Indian tribe is entitled to use that water for any purpose that it sees fit. I know your time's up, and I'll give you some rebuttal, but is the argument of the United States and the Pueblos in the adjudication phase of this that they're entitled to any reasonable future uses of the water? And if that's your argument, how is that quantified? In the issue three of the five issues that were identified in the district court that needed to be decided before we could have a trial of the water rights of the Pueblos, issue three is how do you quantify aboriginal rights? And it hasn't been done. We admit there is no precedent for that. We suggest, and the United States suggests in a joint brief, that because aboriginal rights are intended to be like Federal Reserve rights to preserve a tribal homeland, they ought to be quantified in the same manner by looking at practical irrigable acreage. We suggest that as a measure. Now, the district court, of course, is free to find any other measure it finds appropriate, and there are other courts that have said that other factors could be looked at. But the important point is we do not seek an infinitely expanding right. We simply seek the right to have aboriginally characterized rights, that is, with a time and memorial priority, not subject to loss by nonuse and superior to any other. And what's the limiting principle for we're not asking for an infinitely expandable right? Can I ask one question? I'm going to ask the same question I started this with. That's not the issue before us now. It is not the issue before us. Yes, Your Honor. We might decide if it comes back that the aboriginal right is the amount of water they used in irrigation in 1840 or something like that. You could decide that. I would be back up here arguing with you. But you could indeed, yes. And one other kind of practical question. This case has been pending since 1983. That's correct. You know, Dickens would be winking. That's new for us. Are there other aboriginal water rights involving New Mexico Pueblos that are pending, or have those other cases been resolved or settled? Yes, Your Honor. There are nine Pueblos on the Rio Grande whose rights have not been adjudicated. All of those Pueblos probably would claim aboriginal rights because they're all in the places where they were before, except for the Pueblo of Sandia, they're all in the places where they were before the Spanish arrived. And that's all on the Rio Grande watershed? That's on the Rio Grande watershed. I should say that there are also a couple of tributaries that are still in litigation. And, again, the issue of aboriginal rights would become relevant. And that's all in the district, somewhere in the district of New Mexico, federal courts? Yes. There's one case in state court, but most of the rest are in federal courts. But every one of those has a case pending someplace. The Rio Grande is not in litigation. All of us sort of dread to think that someday it may actually turn into a litigation. Depending on how this case comes out. All the Rio Grande cases are not now, and none of the Rio Grande cases now are in litigation. That's correct. The cases that are in litigation are all tributaries to the Rio Grande. All right. Let's hear from Ms. Singer. May it please the court. Your Honor, I will speak for seven and a half minutes, and then I will give seven and a half minutes to the Coalition of Association of Community Secures. I would note also that Counsel for Amici Sunny Nixon is here for Tri-State, and Rebecca Dempsey is here for the Rio San Jose Association of Community Ditches. It's hard to know where to begin, Your Honors, because the first thing I would like to clarify for the court is that the state and the court have not taken the position that the Pueblo's water rights are extinguished by this court's ruling. The ruling before the court is actually very narrow. It's the issue of whether the district court correctly determined that the Pueblo's aboriginal water rights were extinguished by the imposition of Spanish control and dominion over the use of the resource in a manner that was adverse to the Pueblo's former exclusive use of that source. It is not that the Pueblos do not have a right to use the waters of the Rio Jemez. It is who controls that right, who has access to the right. When the Spanish crown imposed its regalia upon the waters of New Mexico, the waters of the Jemez River system, through its oath of vassalage and obedience that Oñate had the Pueblos swear to him, that recognized that the rivers were in common, that is when the waters became a shared source. Clearly, at the time that the grants were made, the waters became a shared source, and the Spanish crown imposed its authority over the use and distribution of that water. What's the difference between the Spanish crown's rights, sovereign rights, and the U.S. rights? If Congress wanted to abrogate any of the sovereign rights of any Pueblo or any other tribe, it has authority under our Constitution to do that. It hasn't done it, and the cases say until it does it in a specific way and exercises that right, the aboriginal rights remain. What's the difference between the rights of the Spanish crown and the rights of the United States here? I don't understand that. Your Honor, I'm not sure I understand that I've made a difference between the rights of the Spanish crown and the rights of the United States. You're saying the fact that Spanish law gives the rights of, I'm going to get the wrong term so I won't use it, regalio? Regalia. Regalia. But that in itself abrogated the Pueblo's rights without any act being taken to say you can't use this water, you can't use this land. And I don't understand what's the difference between that power under the Spanish sovereign and the power of the United States sovereign, which I think it's uncontested that the federal government could take away any sovereign right of a tribe if it decided to. You're correct, Your Honor, and I apologize if I meant to say that. So there are no aboriginal rights of any tribe now in the United States? No, we're talking about the Pueblo's rights, aboriginal rights to use water for consumptive uses for irrigation. But your theory is that those were lost simply because the Spanish crown had sovereign authority to do stuff. No, Your Honor. They're not? No. What are you saying? District court correctly applied the controlling law of Santa Fe Pacific and looked at the circumstances cited by the experts for the United States and the Pueblo that laid out a pattern of how the Spanish crown had asserted its authority over the uses of the waters of shared public resources, shared public stream systems in New Mexico. This is not just by the mere act of discovery that the waters of this Jemez River became a shared public resource. It was by Spanish colonization and by conquest, which, by the way, is also another one. By the sword is another way that the water rights of the Pueblos could have been extinguished. So why is that different from saying how Congress can enact a statute? Don't you need a divertimento, is that the right word, to actually assign and restrict the water right before you have what's required by the Santa Fe decision of the Supreme Court? Well, Your Honor, I think it's more akin to does the state of New Mexico have jurisdiction over the waters of the state by virtue of the Constitution or only by virtue of an adjudication in the event of a dispute? The Spanish crown imposed its authority and control over the right to the use of waters of the shared stream system. It allocated that resource. It reserved to itself the right to do that, not to the Pueblos. The Pueblos do not dispute that it was the Spanish crown that had the authority to allocate the rights. But it never did take any action against the Pueblos to limit their use of that right. I'm struck by Judge Hartz's argument that the U.S. government has potentially the same power. And does that, just the existence of the power, extinguish the aboriginal rights? Or do you need concrete restrictions on those rights? Because, at least the way the briefs recited it, it seems like the Spanish were very solicitous about the Indians' rights. And did not limit their use of the water. Your Honor, there is no evidence that the Spanish crown needed to intercede and conduct a repartimento on the Jemez River. But there is evidence that the population of the Pueblos was severely reduced by Spanish contact and Spanish conquest. So the Pueblos did not need the same amount of water they had used before. And in fact, the land grants were established upstream of the Pueblo. Necessarily, were using water that previously had been exclusively used by the Pueblos downstream. Is there any evidence that the use by the Pueblos was restricted in any way? That they had to reduce their use at any time before the area became part of the United States? No, Your Honor. But, again, that is not the test for extinguishment of aboriginal title. It is whether those uses were inconsistent and interfered. The uses of the sake is interfered. Why do you say they were inconsistent if the Pueblos still didn't have to reduce their use at all? If there was some evidence that at one point when the stream was very low, that the authorities under Spanish or Mexican rule said, you can't use as much water this year. It needs to go elsewhere. That would be the sort of exercise of the sovereign power. But just the existence of sovereign power seems to be what you're relying on. Well, Your Honor, again, it's akin to a right to use water. You cannot use it to the detriment of others. So even if the Pueblos were not required to decrease their uses of water, based on the facts that may have existed at the time, that they did not need the same amount of waters they used, the experts agree that they could not increase those uses to the detriment of others. And that is precisely the characteristic of an aboriginal water right that the Pueblos claim. The experts didn't agree with that. The experts, that's not what's stated in the record. But let me ask you a broader question. There's a passage in Santa Fe that I'm surprised hasn't been referred to by anybody, because it seems to me it says that whatever Spanish law required, we don't care in terms of recognizing aboriginal rights. And let me read from this paragraph on 345 to 346 of Santa Fe. That's 314 U.S. It starts out, it quotes from Kramer versus United States. It says, the quote from Kramer is, unquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States. And then later it says, later in that paragraph it says, whatever may have been the rights of the Hualapaya, I hope I pronounced that correctly, under Spanish law, the Kramer case assumed that lands within the Mexican Cession, I guess that's the land acquired from Mexico, were not accepted from the policy to respect Indian right of occupancy. Now I would have read that as saying the United States is going to recognize aboriginal rights regardless of whether Spain did. Can you straighten me out why that's not the correct reading of that? Your Honor, let me, yes, I agree, Your Honor, that is correct. And actually that statement is what the statement that says it would take plain and unambiguous action to deprive the Hualapayas of the benefit of that policy. The policy being that aboriginal title applied to the Mexican lands, the Mexican Cession. And the court ruled that the Pueblos did. I'll give you a chance to answer. I'm sorry, am I actually into the time for my co-counsel? I'll give you time. Thank you. Your Honor, what that seems to be saying is it's not enough that that's the law, that that's the Spanish law. There has to be action. There has to be action. That's what Judge Ebell was asking about, what action was taken. You're relying on the possibility of applying some law that says you can't take water to the detriment of others. But the only time that law was applied to a Pueblo, as Mr. Hughes was reporting, the ruling was that the Taos Pueblo was the ultimate sovereign, the ultimate owner of the water. So maybe it could have been a divertimento reduced and said, look, these settlers downstream need this water or so on. But it never happened. It never happened. Your Honor, there are just three things in response to your question. One is that the test for extinguishment of aboriginal title does not require affirmative acts. This is only to deprive them of the benefit of assuming that the policy of Indian title applies to the lands of the Mexican Cession. But this test for extinguishment of aboriginal water rights, articulated in Santa Fe Pacific, does not require specific affirmative acts. In fact, it says it can be implied from the circumstances. It should not be lightly implied, but it can be implied from the circumstances. It's a question of intent. So there may not be a specific affirmative act that responds to that intent. And the Court here relied on the circumstances cited by the expert of the United States who agreed that the waters of the Jemez River became a shared resource. The repartimento that Mr. Hughes refers to that happened in Taos is not the only time there were disputes between the Pueblos and non-Pueblos over water in New Mexico. Santa Clara Pueblo had disputes, and there were conciliaciones conducted with Tezucue Pueblo, where Tezucue tried to make new uses and was told by the Spanish Crown that they could not make those new uses to the detriment of downstream settlers on the Spanish land grant. So the repartimento was not the only way the Spanish Crown asserted its authority. Nor did the Spanish Crown find there, or the Mexican I should say, that they were the sovereigns of the water. The Spanish Crown applied the same factors it applied to everybody else in the territory to find that they had primacy, priority, need, and they'd been there a long time. But those were not the only factors, and they did not recognize them as sovereigns and owners of the water. You're running short on time. I'm sorry, Your Honor. Thank you. Could you give them five minutes? May it please the Court. I'm Larry White, and along with John Hutton sitting at the table, we represent the Jemez River Basin Water Users Coalition. That coalition is basically the predecessors of our clients. Water users were given grants to farmlands that they were farming in the San Ysidro grant in 1786 and the Canyon de San Diego grant in 1748. I believe Your Honors are familiar with those grants. Those grants included, and it's uncontroverted, the implied right to use water. Subsequently, there was a partial final decree entered in this case in 2000 that adjudicated the rights of those parcientes and the acequias within those grants. They are established, the priorities, I think, date from 1786, and there's a few that are subsequent to the Treaty of Guadalupe Hidalgo, but they're all prior to 1900. How much water do you concede the Pueblos are entitled to under your theory of the case? Excuse me, Your Honor? How much water are the Pueblos entitled to under your theory of the case? Okay. Now, they claim that quantification isn't before this court, but you cannot consider their aboriginal water right claim without considering what the nature of that claim is. Their claim is that it is an expanding- Isn't that the next step in the agreed procedure, though? I agree. I would much rather have had the aboriginal claim, as the Chief Judge was saying, resolved first, and then we can get to see whether it was abrogated in some way. But unfortunately, at least in my view, the parties picked a different order. So you're right, that's extremely important, but we're not going to be able to decide that. Well, Your Honor, I think what is before the court is the nature of that right. No, it's whether it exists. We're not asking you to quantify. Excuse me, but what they want is a future water right to future expanded uses with a first priority, which would basically eviscerate all my clients' property rights within the grant. And that's why you're very interested in that, but that's the next step in the process. What the district court said is there's no aboriginal right. That's the ruling, and that's the only issue before us, I thought. Your Honor, if I may quote from the court. This is the last page of the 2017 opinion, and I'll start. Spanish law plainly provided the waters were to be in common to both Spaniards and Pueblos, and that the Pueblos did not have the right to expand their use if it were to the detriment of others. That's all we're claiming here. Although Spain allowed Pueblos to continue their use of water, that's referring to actual use, and did not take any affirmative back to decrease the amount of water the Pueblos were using, the circumstances cited by the expert for the U.S. and Pueblos, plainly and unambiguously, indicate Spain's intent to extinguish the Pueblos' right to increase their use of public waters without restriction. That is what their claim has been, and I'll get into that in a minute. But just pause for a minute. The order was very lengthy and dealt with a lot of things, but we have a certified question, which is in the first sentence very discreet, the issue of whether the imposition of sovereign authority without an affirmative act is sufficient to extinguish the Pueblos' aboriginal water rights. And they say that's novel and difficult, a first impression, and because it may help decide the case, and indeed the way the district court ruled, it did help solve the case. It got rid of it. And so we only have the authority at this point for that one certified question. It has nothing to do with the scope of the rights or whether they would allow the Pueblos to expand their water use or not, or whether they could use it for bottling versus drinking or anything else. It's just that one question. Your Honor, as stated in our brief under paper allied under what question is certified, it's the order, which is the actual 2017 order. Well, you didn't put the full statement of what we said. It's very restricted how much we might possibly expand the question, and those requirements are certainly not satisfied here. And at best it's discretionary on our part whether to go into those things. Well, let me just answer something Mr. Hughes brought up, and he said that as of the date that Onate set foot here, 1598, that that wasn't sufficient to extinguish their aboriginal title. However, the acts, if you look at it, I maintain that what is here is talking about the entire history of the Spanish regime, and basically the acts that are present. Now, I think what Judge Vasquez was referring to was that extinguishing absence of a repartimento, which was always the claim below by the U.S. and Pueblos. They said there's no repartimento, so there was no act extinguishing our title. However, during the Spanish regime, upon conquest itself, the king of Spain exercised his regalia, was able to do that over water. Now, clearly the court and Magistrate Lynch found that the interest in land was different than the interest in water. Spain recognized the Indians' right to occupy their land, but Spain declared water to be in common to Spaniards and Indians. There were two acts in the recopilacion, which would be equivalent of our Acts of Congress, and that is clearly an affirmative act saying the Pueblos don't have anything over the Spaniards with regard to the allocation of water. The other thing, the fact that there were grants to our client's predecessor, that shows that the king of Spain recognized that Spaniards had the right to use water also. As of the end of Spanish sovereignty, I think the rule was either one could expand their use provided there was no entry to any other. That was another circumstance that the court obviously relied on. Then you get actually up into the Mexican period a little bit, and the Plan of Iguala provided that Indians and Spaniards were equal, totally equal citizens. You've gone over your time. Could you go ahead and sum up and complete your thought? Your Honors, I believe there's really no such thing as an aboriginal Indian water right. No cases. The only case that even comes close to coming to an aboriginal water right was the district court's opinion in Amit 2, where it indicated that they had an aboriginal right to expand, but that that was terminated by the 1924 Act. Other than that, there is no case that holds that aboriginal title gives any Indians, any Indian tribe, which of course the pueblos are different, but any Indian tribe a winter's right or expanding right quantified by PIA under an aboriginal title theory. It just doesn't exist. All right, Counsel, thank you. We appreciate it. Thank you, Your Honors. I'll give you three minutes for rebuttal. Thank you, Your Honors. We would ask you to address the certified question, and we believe we've demonstrated that the district court was in error in holding these aboriginal rights extinguished, and we ask you to reverse. We do think that the petition was appropriately granted, and this will facilitate the resolution of this litigation. There was no affirmative act. The grants were not an affirmative act by Spain. These were brought in by the state and the coalition late in the briefing, but those grants gave no definite water rights to the Spanish settlers. In Pueblo of Jemez, this court held that the Baca land grant did not extinguish the Pueblo of Jemez's aboriginal rights to that area because there was no explicit extinguishment of those rights. There is nothing in these grants that comes close to that. The state and the coalition have pointed to provisions of the Recopalacion as acts. They're not acts, and they even ignore the provisions that demonstrate that there was a solicitude and a preference shown toward the Native Indian community. So we rely on Santa Fe Pacific, that it does require something more than happened here, that this notion that somehow the Pueblos have fewer rights than other Indian tribes because they were under the sovereignty of Spain has no basis in the law because two-thirds of the country was under the sovereignty of Spain, and there is absolutely no way of distinguishing the unexercised Spanish authority over the Pueblos from the unexercised Spanish authority over the Indian tribes who lived throughout the rest of their massive territory in the United States. So I have a minute and a half, but that's basically what I have to say. In other words, we should be stockpiling not only toilet paper, but water. There may be disputes about many resources in the future, Your Honor, but this is not the way to resolve the Pueblos' water rights by saying that they were extinguished by operation of Spanish law. That is simply wrong. The parties will work hard to resolve this litigation, but this is not the way for the Pueblos' aboriginal water rights to be resolved. Thank you, Counsel. Counselor, excused. And the case shall be submitted. We appreciate the arguments this morning, and the court will be in recess.